We'll hear argument next, and Ahmed v. Astoria Bank, 161389. Good morning, Your Honours. My name is Fred Profeta, and I represent the plaintiff, Sharon Ahmed. This is a hostile work environment case under Title VII. The plaintiff, Ms. Ahmed, described her race as black. Her country of origin is Egypt. She's a Muslim. She wears a hijab. She emigrated to this country in 1995, and she became a citizen in 2001. She also went to community college here and got a degree in accounting. There are a lot of facts in this case, but I'm going to just focus on the central ones, because I think that's what makes the case for reversal. They involve very humiliating, very frequent conduct, remarks, and actions by two persons, Mr. Anthony Figaro, who's the head of the department, and her immediate supervisor, Maureen Russo. Now, Figaro had worked with Ms. Ahmed before at Sovereign Bank, so he knew her. She was hired on a very unfortunate date at Astoria, September 11, 2013. She was hired for a probationary period of 90 days, so after the hiring takes place, she's outside talking to co-workers, and Figaro walks by, and this is what he says to her. He says, Hello, you still look the same. Take that rag off your head. I don't like it. He said this in front of all the other people who were there. Then he makes a bad joke about terrorists, saying, Oh, at least I'm on the other side of the building, so if you blow this up, you won't get me. That was the first thing. But this was just the beginning of his bombardment of her with remarks and talks about this rag. That's an interesting question. In both the deposition and in the declaration, it seems to me there's a striking lack of statement by Ms. Ahmed that these repeated comments about the hijab actually occurred at Astoria Bank as opposed to in the prior employment at Sovereign. Can you point to where she says that this occurred at Astoria Bank? Yes. In her declaration, this is on page 461. This is where she says, On several occasions, Figaro made inappropriate jokes about my race, ethnicity, and religion. Now, that relates to jokes. Those statements, and he told me to take the rag off my head, and he constantly told me to remove the hijab. But it doesn't say that this— Now, this follows paragraph 11 that talks about the interview at Astoria Bank. But then, of course, she goes straight into the whole story of her prior fiancé, which all occurred at Sovereign Bank. True. So, I'm just having trouble— We are to infer, and of course we're supposed to draw inferences in her favor, but it seems a little odd when we're talking about things that she herself says, where the dates could have been provided, where it could have been made clear. We're to infer that because paragraph 11 talks about this sort of terrorism statement, which does not refer to the hijab, although in other testimonies she says that occurred on that date, too. Yes. But then she goes into these several occasions, the things that he says about the hijab, the things that had to do with Osama, her prior fiancé, all follows after that. Is it just the idea that because paragraph 12 follows paragraph 11, we're to assume that that is a reference to statements that were made at Astoria Bank? No question, but that her statement, he constantly told me to remove my hijab, refers to Astoria. Why? Why is there no question? Because in paragraph 16, she's going on saying things that happened at Independence Sovereign Bank. Oh, let me just— And in her deposition, she also, when asked about, you know, did he keep saying things about the hijab, she says, oh, yes, he did. I mean, at Sovereign Bank, not at Astoria Bank. Well, I know. She did, but she separated it. I mean, this is clearly—this first comment about the rag occurring at Astoria is clearly on the day she was hired. That's when he came—that's when Figaro came by. And look— From 8 to 15, you say it's clear enough that that refers to Astoria Bank. Well, I mean, Judge, this is not the best drafted declaration that I've ever seen. But, again, as you point out, you're supposed to draw the inferences in her favor in this. Let me give you what I think is a little help in that regard. Later in her deposition, she talks about the last day when she, for some reason, decided that she was safe. She couldn't be fired. And now she was going to tell Mr. Figaro and Ms. Russo about these comments and what she thought. Now, here's what she said. So this is now summarizing in her mind what had happened. And, of course, this is all questioned by the defendant. So you went into his office. What did you say to him? What page are you— Oh, I'm sorry. Page 418 of the appendix. I told him comments are getting really too much, and I don't like the way my religion, culture, and belief is being represented. And I think I'm being discriminated against. This is too much discrimination, and this needs to stop. This is all Astoria. And this is what she said. This is on her termination date. Right. And she hadn't been terminated yet. Right. What prompted you to go into his office on that date? Because I had enough of these comments. This really had built up to a point where she was under an incredible amount of stress. One question I have, though, Mr. Perfetta, is the discrepancy between the complaint and the declaration in terms of the numbers of statements by this gentleman. And it seems to me that she gives a more—says that it was quite frequent in her declaration, but that doesn't come through in the deposition. No. She does— So that's my question. My question, can you—I mean, obviously, you know, it's one thing after the summary judgment motion is filed, and, you know, there's a need to kind of improve the record to some extent. But if there's a discrepancy between what's said in a deposition prior to that, and then you've got the final statement trying to patch up the holes, that's a problem for you. Well, it's not contradictory. There's no contradiction between the two, and that's what you need to do. If you're going to throw out a later declaration because of a prior deposition, it has to be a stark contradiction. That's what the case law says. We don't have that here. I mean, I wish you could see her. She doesn't speak unless spoken to. She is reserved. This is, I think, what a jury has to see. Your argument is that in the context of the deposition, they should have followed up on some questions and failed to do that. She failed to do that. That's right. It wasn't there. But then she later came—she told her whole story. But let's face it. She—in her deposition, when she talks about what she said to Figueroa and Russo, she made it pretty clear, very clear for this woman, that this was ongoing, constant behavior, and she had had enough because it had just gotten to a level where she couldn't tolerate it. That's the deposition testimony that I read to you. You have reserved two minutes for rebuttal, so we'll hear from your adversary. May it please the Court, my name is Mark Mantra. I represent Astoria Bank and Maureen Russo. I think it even goes a little further than the fact that this declaration was inartfully drawn. I think you need to look back at how this case unfolded. She brought an EEOC complaint in February of 2014. That EEOC complaint has not one word about Mr. Figueroa. The bad actor entirely in that complaint is Ms. Russo. Six months later, she brings a complaint. In that complaint, again, there is no reference to Mr. Figueroa—I'm sorry—other than the fact that Mr. Figueroa hired her, and the fact that Mr. Figueroa apparently trusted her enough to give her some overtime work. She then amends that complaint, a different lawyer. And with that lawyer, submits a complaint again, which never mentions Mr. Figueroa as the bad actor. You've got a great trial case so far. Everything to that point is about Ms. Russo. Let me tell you two legal issues that we think arise from that. One, and we raised this issue before, though Judge Weinstein didn't address it because he versed on other grounds. We believe that the fact she didn't raise it before the EEOC meant that she did not exhaust her administrative remedies. Now, you have an EEOC complaint. The EEOC certainly has put on notice that it has to investigate that. There's language in a wide variety of cases which basically says that if you're talking about the same actor— She did exhaust her remedies as to Astoria Bank. What she did was—well, yes, as to Astoria Bank, however— Title VII is as to Astoria Bank, is it not? Well, yes, it is. That's what's in front of us. That's correct. Okay. However, the purpose— Is there any precedent that you're aware of that says that if an employee files a charge with the EEOC saying I was subjected to a hostile work environment and lists three people who made nasty remarks, that she didn't exhaust her administrative remedies that would preclude her from relying at trial or at summary judgment on a nasty remark by a fourth person at the same company? I would point you to language in Potter at 548 F. 3rd, page 76. In that case, in some ways, it's even weaker than this case because it's talking about the same person, but they said, look, that was the case that was reversed on a single incident. Basically, a supervisor beat up the plaintiff, and the question was whether or not that was sufficient by itself to be a sole incident hostile environment. As the case unfolded, later, after they went to the EEOC, they claimed that, well, it wasn't just the beating. It was the fact that well before that, that person engaged in retaliatory and discriminatory conduct going into the past. They held that that didn't put the EEOC on notice. It also quoted a case, and the language was— Well, all right. I hear what you're saying. May I ask, in the deposition of Ms. Ahmed, is she ever asked the question, can you remember any other comments by Mr. Figaro? Can you remember any other comments by anybody that you're relying on? The answer is yes. Unfortunately, that was not included in the record to Judge Weinstein. We made a motion to expand the record. That was denied. So there's nothing on the record? So there's nothing on the record. Let me just say something else about that. The deposition, the complaint prior to the deposition that was operative at that point mentions nothing about Mr. Figaro. So there's nothing about Mr. Figaro engaging in any type of constant activity. The testimony comes through. It's asked about the issues in the complaint. There's nothing in the complaint about Mr. Figaro engaging in this. We finish our questioning, and now there's an opportunity. This is only one of about six opportunities plaintiff had to include that there was some constant activity. Plaintiff does not stand up and say, you were asked about what happened before. You were asked a little bit, or you said something about what happened on the first day. Tell us if anything else happened. So, yes, it could have been asked by us, and, yes, I'm not saying that there was a burden on the other side to do that. However, given the posture of this case where there have been so many complaints in which Mr. Figaro was never mentioned, that certainly would have been an appropriate and a prudent thing for him to do. She does say something that can be inferred to be talking about behavior at Astoria Bank in the declaration. That is in the record for summary judgment, and you are arguing that it should be disregarded because it contradicts her deposition testimony. The argument by Mr. Profeta is that it simply supplements the deposition testimony because she was questioned about this specific incident, she told about it, and she was never asked, is that it for Figaro? Let me just refer to Brown v. Henderson, which is where the standard quote about something being contradicted by the deposition comes up. But there was something else in Brown. It said, you know, they looked beyond just the deposition, and they looked even to the EEOC complaint, and they said that we really believe we have a sham issue of fact here because basically the entire theory of the case has changed. Talk about a pivot. This case was never about Mr. Figaro for a year and a half after the EEOC complaint. It was only on a third amended complaint that they even attempted to bring Mr. Figaro into the case. You would include the failure to include a name as a form of contradiction. That is, you failed to include that fourth name in the EEOC complaint, but then you include that fourth name subsequently, and that's a contradiction. I think it's more fundamental than that. I think that what happened here was that the entire case was based on the conduct of Ms. Russo. That was the case before the EEOC and going forward. That there may have been incidents with Mr. Figaro back in Sovereign Bank, but in fact there really was not a problem with him at Astoria. After it became clear that the incidents involving Ms. Russo were not enough to justify a hostile environment, Mr. Figaro was added into the mix. I think Your Honor is exactly correct that if you look at every document in this case, they appear to be artfully drawn to avoid one question. That question is, while at Astoria Bank, did he constantly refer to your hijab? One, the only reference she made is on that day she was interviewed, even before she was hired, and even that essentially was sort of going off script. So I would urge that that type of fundamental... Is that the only claim in the deposition against Figaro? I'm sorry, excuse me? Is that the only incident involving Figaro in the deposition? If you... I thought there might have been another one. No, that was clearly at Sovereign Bank. But there are two comments. The hijab comment and the what are you three up to comment that are both at the deposition said to have taken place on the occasion of her first visit to Astoria Bank. Correct. Those are the only places where there is any specific reference to him actually doing anything there. And there's no reference to him doing anything at all thereafter. And frankly, I believe in light of all the testimony and everything else that the mention of the hijab there, because every time she speaks about the hijab, it's a little bit different. She says that he said it at the same time on the occasion. However, in all the other references, as Your Honor noticed, it is sort of separated out from that incident. Doesn't this case really turn on the frequency? I mean, it has to turn on the frequency because an isolated incident, I mean, it can be a hostile work environment, but it's rare that that is a hostile work environment. So what we have to do is focus on, and this is true of both counsel, as to whether this was a repeated event or not. That's correct. And what I'm urging you is to not – to basically say, look, while they're entitled to every inference, you can't put facts in that aren't there. If the testimony came forward – I would like to say on several occasions, Figaro made inappropriate jokes about my race, ethnicity. Well, particularly when – particularly when it's not at all clear whether they're talking about something that happened five years before at Sovereign or something that happened at Astoria. They studiously avoid saying that these comments were made at Astoria. And given the entire history of this case, where Figaro only lately comes to the game and is even accused of anything, that has to be looked at very suspiciously. Thank you very much. Thank you. Ms. Ahmed did not studiously avoid telling Mr. Figaro and Ms. Russo about what those comments were like. Constantly, at the end of the 90-day period, there was no avoidance. She said it. She said it in her deposition under oath. That's clear. But I think what's also very clear here is that there has been an avoidance by Astoria to talk at all about the second half of the case. I mean, it isn't just Mr. Figaro. It's Ms. Russo. And there's no doubt, Judge Walker, when we talk about frequency, that this was frequent. This was every day. Every day, knowing full well that this woman is an immigrant, Ms. Russo speaks very slowly to her and with hand gestures and says, You take the files out of the cabinet. You put them here. He does this all in this very demeaning manner. The problem with that is that it's not directly linked in the same way the other testimony is to her being a Muslim. And that's the claim, really, that she's being discriminated against on the basis of her origin and her religion. And so, you know, there are incidents like she didn't get some chocolate one day or she, you know, was delayed. Couldn't take some time off to go to a religious service after she had said early on that she wasn't going to take any time off in the three months that she was there on probation. I don't press those. Oh, okay. Those are not substantive in my mind. I know they were mentioned below. But here's the important thing about what you said, Judge Walker. This is not the hand gestures. The slow talking is not linked to her being a Muslim. It's linked to her being an immigrant. And she does talk with a heavy accent. So it's very easy for her to infer and for all of her coworkers to infer. Is that something that links her to her religion, links Ms. Russo's actions and or statements to Ms. Ahmed's religion? Yes. I don't have time. In my brief, you'll see she says, too, you know, you really shouldn't wear that hijab. I mean, and she says. She doesn't say that, actually. Right. What she says is, I mean, and I mean, you know, we're going to quote things. Let's quote them. Because you have an argument to make here. It's a fair argument. She says something about, I don't understand why Arab women cover their hair. This is in the context of a conversation about Ms. Ahmed saying that she sent her daughter to have her hair done in preparation for the holiday. And Ms. Russo says, oh, it's really wonderful when women get their hair done. I really feel great when that happens. And I understand why Arab women don't do that. Now, that's an insensitive comment. It's linked to her religion. It comes into play here. It's relevant. But she does not say you shouldn't wear that. Right? She says, I don't know why you wear it. I mean, you're right, Judge. You quoted it much more accurately than I did. But the inference is, why do you wear that thing? Right. Okay? And the other thing is she does. But why do you wear that thing is a lot different than a conversation about, I don't understand why people in a certain culture do this. I don't want to overstate it. I was just answering. You answered my question. Yeah. Was there any link to her being a Muslim? I also said 9-11, the date reminds me of terrorists. And that's a pretty big statement. You took the words out of my mouth. And that was the first conversation she had with me. So everybody knows she's focused on her being a Muslim. Thank you very much. Thank you very much. That was our decision.